## UNITED STATES LINES CO. v. UNITED STATES.

District Court, S. D. New York.

Nov. 23, 1943.

Kirlin, · Campbell, Hickox, Keating & McGrann, of New York City (Cletus Keating and Donald D. Geary, both of New York City, and Harold B. Finn, of Washington, D. C., of counsel), for libellant.

James B. M. McNally, U. S. Atty., of New York City (Francis M. Shea, Asst. Atty. Gen., and George C. Sprague, Sp. Asst. to Atty. Gen., William E. Collins, Sp. Asst. to U. S. Atty., of New York City, Arnold W. Knauth, and J. Frank Staley, Sp. Assts. to Atty. Gen., of counsel), for respondent.

RIFKIND, District Judge.

This matter comes up on a motion to overrule the exceptive allegations of the respondent to the libel by which the libellant seeks to recover $—— for the loss of the S. S. X, by a marine risk, while the vessel was in the possession of the respondent under a demise charter. The precise issue raised by the exceptive allegations is one of jurisdiction; and the decision turns on whether the bareboat charter, under the terms of which the U. S. Maritime Commission hired the vessel from the libellant as owner, is also a contract of insurance within the meaning of the act of June 6, 1941, 55 Stat. 242–245, extended by 56 Stat. 370, 50 U.S.C.A. Appendix, § 1271 et seq.

Section 3 (a) of the act of June 6, 1941, authorized the Commission to charter vessels. Section 3 (b) authorized the Commission to insure vessels so chartered and made the Maritime Commission Insurance Fund, established by Public Resolution 94, approved July 18, 1940, 54 Stat. 766, available for the payment of insurance losses. The same section made applicable the provisions of Sections 225 and 226(a) to (e), inclusive, of the Merchant Marine Act, 1936, as amended, 46 U.S.C.A. §§ 1128d, 1128e. The first sentence of Section 225 reads as follows: "In the event of disagreement as to a claim for losses or the amount thereof, on account of insurance under this subtitle, an action on the claim may be brought and maintained against the United States in the district court of the United States sitting in admiralty in the district in which the claimant or his agent may reside, or in case the claimant has no residence in the United States, in a district court in which the Attorney General of the United States shall agree to accept service."

Libellant bases its allegation of jurisdiction upon the applicability of this section to its claim. If the claim is not an insurance claim, this Court is without jurisdiction. Whether the claim is within the jurisdiction of the Court of Claims, see 28 U.S.C.A. § 250.

The libel alleges that the libellant and the United States Maritime Commission entered into a bareboat charter made as of the 6th day of June, 1941, pursuant to the Act of Congress approved that day, and that: "Fifth: As part of the consideration for the use of the said steamship X, in addition to the payment of charter hire, the said United States Maritime Commission, as authorized by said Act, also insured the said United States Lines Company (Nevada) in the sum of $——, the agreed value of the said vessel for insurance purposes, against a total loss of the said vessel from any cause or risk whatsoever; and further agreed that in the event of a declaration by the said charterer of the constructive total loss of the said vessel, the owner thereof would forthwith be reimbursed in the same amount as in the case of an actual total loss, to wit, the said sum of $——."

Libellant does not contend, however, that the Commission issued any policy of insurance, so called. It relies upon the charter party itself as being, in addition, an insurance contract. In its brief, it puts the question thus: "The question, therefore, to be decided by this Court is whether the Maritime Commission's con-

tract, No. MCc–1670, in addition to being a charter party, is an insurance contract."

Since it is not disputed that the Commission had the power to insure, the question is merely whether it exercised that power. Libellant argues that no particular form of writing is required to constitute an insurance contract and that by Clauses 15 and 16 of the charter party the Commission assumed the risks of an insurer.[1]

In support of its contention libellant also refers to three papers which, it claims, throw light upon the charter.

The extraneous papers consist of a telegram to libellant by the Chairman of the Commission under date of June 14, 1941, a receipt of the same day delivered by the Commission to the libellant, and a letter from the Commission to the libellant under date of July 15, 1941. The text of the last of these is set forth in the margin.[2]

It should be noted that these documents are dated after the effective date of the contract but were in fact delivered before the charter party was actually signed. While there may be some question whether these papers, which are annexed to the libellant's answer to the respondent's exceptive allegations, may be properly read on a motion to overrule the exceptive allegations, in the view I take of them, that question need not be answered. Manifestly, these papers were not intended to survive the execution and delivery of the charter party, and the libellant does not contend otherwise. Libellant, however, desires to read these papers as reciting

---

[1] "Contract No. MCc–1670

"This Bareboat Charter made as of the 6th day of June, 1941, between the United States Maritime Commission (herein designated as the 'Charterer') and United States Lines Company, a corporation organized and existing under and by virtue of the laws of the State of Nevada (herein designated as the 'Owner').

\* \* \* \*

"E. Operation of the Vessels

\* \* \* \*

"15. *Marine and War Risk.* The Charterer shall assume war, marine and all other risks or liabilities of whatsoever nature or kind, including all risks or liability for breach of statute or for damage caused to other vessels, persons or property, and shall indemnify and save harmless the Owner against and from any and all loss, liability, damage and expense (including costs of court and reasonable attorneys' fees) on account of such risks or liabilities. In the event of the total loss of said vessels or any of them, the Charterer shall forthwith reimburse the Owner for each of said vessels lost, as follows:

"x     $——
"y     ——
"z     ——

"16. *Constructive Total Loss Liability.* In case of damage to the vessels (not amounting to total loss) during the period of this charter, the Charterer shall have the option of declaring the vessel so damaged a constructive total loss by so notifying the Owner in writing or of restoring the vessel before redelivery to the Owner to a condition at least as good as when delivered to the Charterer hereunder, ordinary wear and tear excepted. In the event of a declaration by the Charterer of the constructive total loss of said vessels or any of them, the Charterer shall forthwith reimburse the Owner for each of said vessels so lost, in the amount indicated in paragraph 15 above in the case of actual total loss."

[2] "United States Maritime Commission
"Washington
                    July 15, 1941
"United States Lines Company,
  "1 Broadway,
  "New York, N. Y.
"Gentlemen:
    "The present existing policies of insurance on SSs. x, y, and z, having expired or being about to expire, the United States Maritime Commission from the respective expirations of such policies will assume all war, marine, and other risks or liabilities of whatsoever nature or kind, including all risks or liabilities for breach of statute or for damage caused to other vessels, persons or property, and will indemnify and save harmless United States Lines Company against and from any and all loss, liability and expense (including costs of Court and reasonable attorneys' fees) on account of such risks or liabilities; and in the event of the total or constructive total loss of said vessels or any of them, the Commission will forthwith reimburse United States Lines Company for each of said vessels lost, as follows:

"x     $——
"y     ——
"z     ——

"This undertaking shall continue in effect up to such time as such insurance or indemnification as shall be provided for by a written bareboat charter duly executed between United States Lines Company and the United States of America shall attach or become effective.
    "United States Maritime Commission
       "By Thomas M. Woodward
           "Vice Chairman"

in effect that "the X was fully insured against marine, war and other risks in the amount of $—— until such time as such new insurance *to be provided for* under the charter should attach"; but neither the telegram, the receipt nor the letter, is so worded. All three carefully state that the insurance shall remain in effect "up to such time as such insurance *as shall be provided for* by a written bareboat charter * * * shall attach."

These communications suggested the possibility that the charter party would provide for insurance. In such a contingency, the insurance then in effect would continue until the insurance provisions of the charter party were executed; but that possibility was not realized unless clauses 15 and 16 constitute an insurance contract. But even if the terminology of clauses 15 and 16 of the charter party is that which is characteristic of insurance policies and even if the scope of liability thereby imposed is the liability of an insurer, it does not necessarily follow that a claim thereunder is within the intent of Section 225 of the Merchant Marine Act. As I read that section, in its context, it was designed to confer jurisdiction upon the district courts to hear claims arising out of the conduct of the government's "insurance business." See Standard Oil Co. v. United States, 1924, 267 U.S. 76, 79, 45 S.Ct. 211, 69 L.Ed. 519.

By the Act of June 29, 1940, 54 Stat. 690, the Merchant Marine Act, 1936, as amended, was further amended by the addition of a "Subtitle—Insurance." Section 221(a) authorized the Commission to provide insurance of the character therein specified. Section 221(b) established in the Treasury a "marine and war-risk insurance fund * * *, to be used for carrying out the provisions of this subtitle." Section 222 specified the kind of vessels the Commission might insure; section 223 regulated reinsurance by the Commission and Section 224 provided for insurance for masters, officers and crews against loss of life, personal injury, or detention. Section 225, already quoted, follows in this setting. Subsequent amendments have not affected the structure here outlined.

The precise definition of the risks to be insured, the establishment of a special fund into which are to be paid "all moneys received from *premiums*", the authority to appoint "experts in marine insurance" (Section 226(d), all point to the establish-ment of an insurance business. As part of *that business,* the Commission is authorized to settle claims and pay losses (Section 226(a); and in the event of disagreement, the United States consents to be sued in the district courts. To say this is to say something quite different from the assertion that a liability assumed by the Commission which is as broad as that of an insurer, is necessarily brought within the purview of Section 225.

In the case at bar the parties have made it very clear that by their charter party they did *not* intend to contract as insurer and assured but only as owner and charterer. This is established by clause 17 of the charter party which reads: "17. *Insurance.* If the Commission shall insure the vessels, or any of them, in its own insurance fund, the Commission shall not, either as Charterer or insurer, have any right or subrogation against the Owner on account of loss or damage to the vessels or their machinery or appurtenances, or on account of payments made to discharge claims against or liabilities of the vessels or the Owner covered by insurance underwritten by the Commission."

"If the Commission shall insure" is inconsistent with a reading of clauses 15 and 16 to mean that the Commission has insured.

It is, of course, clear enough that the scope of liability assumed by the Commission by clauses 15 and 16 is that which we commonly describe as an insurer's liability. Were the Court here concerned merely with the construction of contractual liability, it would make no difference whether the risks were borne by the respondent by virtue of an insurance contract or a charter party. When the English courts were construing form T99, the British Admiralty's charter party, whereby the British Admiralty assumed risks of war, they called it an insurance contract, Attorney General v. Adelaide Steamship Company, Ltd., 1923, A.C. 292, 297 and 300; Adelaide Steamship Company, Ltd., v. Attorney General, 1926, A.C. 172, 181; but the English courts were not under the necessity of making a precise differentiation because they were not concerned with the jurisdictional question we face here.

The same is true of such cases as New Bedford & New York Steam Propeller Co. v. United States, 1871, 14 Wall. 670, 675, 60 L.Ed. 760; Dittmar v. Frederick Starr

Contracting Co., 2 Cir., 1918, 249 F. 437; John L. Roper Lumber Co. v. Portsmouth Fisheries Co., D.C.E.D.N.C., 1919, 260 F. 1008, affirmed 4 Cir., 1920, 269 F. 586.

By the charter party here under examination, the charterer assumed all risks. Had the parties desired the owner to have the additional protection of insurance, the charter party could have so provided. Probably no such provision was made because the insurance would have been underwritten by the same party which, as charterer, had already assumed all the risks.

When, under the law of sales, we say that the seller bears the risk of loss in certain contingencies, we do not thereby suggest that the seller is in the insurance business; nor when we say that a common carrier is, in certain circumstances, an insurer, do we mean thereby that he has become an underwriter of insurance. Ordinary usage is a good guide to the intention of the parties, especially when such usage is reflected in the routine activity of the business, ante litem motam. It is noteworthy that the War Shipping Administration (successor to the Commission) has carefully differentiated between the Administration's insurance liabilities and its other obligations.[3]

Also in the notice of loss annexed to the libel, the administrator describes the War Shipping Administration as the charterer, not as the insurer.

Many contracts apportion risks of one kind or another, and many rules relating to contracts are merely rules as to the allocation of risks which the parties have not expressly provided for. Contracts of sale, bailment, carriage, employment, construction, charter parties, bills of lading and many more contain illustrations of this general proposition. But sellers, bailees, carriers, etc., do not normally regard themselves as engaging in the insurance business.

In Consumers Import Co., Inc., v. Kabushiki Kaisha Kawasaki Zosengo, 64 S. Ct. 15, 18, Nov. 8, 1943, we find a good illustration of the proposition that subjection to an insurer's liability is not the same as engaging in the insurance business. "At common law," said the court, "the shipowner was liable as an insurer for fire damage to cargo. We may be sure that this legal policy of annexing an insurer's liability to the contract of carriage loaded the transportation rates of prudent carriers to compensate the risk. Long before Congress did so, England had separated the insurance liability from the carrier's duty. To enable our Merchant Marine to compete, Congress enacted this statute (The Fire Statute) * * * The shipper was free to carry his own fire risk, but if he did not care to do so it was well known that those who made a business of risk-taking would issue him a separate contract of fire insurance."

In the charter party under examination the parties have annexed an insurer's liability to a contract of hire; but the Commission did not *thereby* engage in the insurance business. And I am of the opinion that unless the libellant's claim arises out of the conduct of the Commissioner's insurance business it is not within Section 225.

Nor can the argument be successfully made that it required but a clerical act to bring the Commission's liability under this charter party within the insurance fund. The Commission was under no duty to do so and consequently no presumption of performance by officials charged with a duty can be indulged here. As already noted clause 17 left the option with the Commission and libellant must show that the option of insuring in the fund has been exercised.

It follows that the motion to overrule the exceptive allegations must be denied. This will necessarily result in the dismissal of the libel unless the libellant abandons its present position and declares that it can prove the fifth allegation of the libel without relying on the charter party alone as the insurance contract. If it will so indicate I shall appoint a commissioner to hear and report on that issue.

[3] "As of April 30, 1942, the War Shipping Administration had in force marine (and) war-risk insurance in the amount of $872,880,633.03. This figure does not include certain liabilities on vessels acquired under Public, 101." Statement of Admiral Land, administrator of the War Shipping Administration, at a hearing conducted by the subcommittee of the Committee on Appropriations, House of Representatives, in charge of deficiency appropriations, May 13, 1942. Public 101, mentioned in his statement is the Act of June 6, 1941.