M. & J. TRACY, Inc.

v.

THE ROWEN CARD et al.

THE CHARLES L. O'CONNOR.

No. 17625.

United States District Court
E. D. New York.

Oct. 14, 1953.

To the Honorable The Judges of the United States District Court for the Eastern District of New York

Commissioner's Report on Damages

By the interlocutory decree and order of reference entered on March 22, 1951, this matter was referred to your Commissioner to ascertain and compute the amount of libellant's damages. It is provided by the decree that libellant is to recover from Card Towing Line, Inc. claimant of the tug Rowen Card 90% of its provable damages without interest and without costs to date but with costs which may be incurred from the date of the decree, and that the libel and impleading petition of Card Towing Line, Inc. against the United States of America be dismissed with prejudice and without costs.

Your Commissioner has taken and filed his oath of office with the Clerk of the Court.

The libel was filed for damages allegedly sustained by libellant's steamer Charles L. O'Connor in New York Harbor on the morning of February 21st, 1945 following a collision of a tow in

charge of the tug Rowen Card, owned by claimant Card Towing Line, Inc., with the steamer. On March 13, 1953, by order entered on consent, Honorable Frank J. Parker, United States Attorney for the Eastern District of New York, was substituted as proctor for libellant in the place and stead of Macklin, Speer, Hanan & McKernan, Esqs.

There were three hearings before your Commissioner, attended by Benjamin H. Berman, Esq. on behalf of Honorable Frank J. Parker for the libellant and John J. McElhinney, Esq. of Foley & Martin, Esqs. on behalf of claimant Card Towing Line, Inc. Libellant's Exhibits 1 to 8C inclusive were received in evidence and, together with original hearing minutes of March 27th and 30th and April 8th, 1953, memorandum and reply memorandum on behalf of libellant and memorandum on behalf of claimant, are filed herewith.

Prior to the reference, the libellant's claim for physical damage to the S/S Charles L. O'Connor had been adjusted and payment had been made to libellant, so that the sole issue before your Commissioner related to libellant's claim for detention of the vessel resulting from the collision in suit.

It is the libellant's claim that the period of detention was eleven days, seven hours and forty-five minutes, stated to be from noon on February 23, 1945 (when the discharge of her coal cargo following the accident had been completed) to 6:00 P.M. on March 6, 1945 (when the vessel reached the Battery, the point of deviation, after the completion of repairs). This period actually represents eleven days and six hours.

Claimant, Card Towing Line, Inc., points out that while the proceeding is now being prosecuted in the name of the libellant, it appears, from the substitution of the United States Attorney as proctor for libellant that it is being carried on for and on behalf of the United States, which was the time charterer of the vessel at the time of the accident. Claimant takes the position that the time charter is irrelevant and immaterial, that the charter hire set out therein is not the proper measure of damages to which libellant might be entitled and that neither libellant nor the United States is entitled to any amount by way of damages for the detention of the ship during the repair period.

Your Commissioner finds and reports the facts as follows:

1. The S/S Charles L. O'Connor was a coal collier of dead weight capacity of 4239 tons and, on the date of the accident, was owned by libellant.

2. On the morning of February 21, 1945, laden with a cargo of bituminous coal consigned to Bath, Maine, she was lying in Liberty Anchorage, Upper New York Bay.

3. The collision in suit occurred at 10:20 A.M. on February 21, 1945 and following the accident, she departed from the anchorage at about 5:40 P.M. and arrived at the Consolidated Edison plant at 42nd Street, East River at 7:20 P.M. when discharging was immediately commenced and was completed at noon on February 23rd, whereupon at 12:25 P.M. on the same day she proceeded to Tietjen & Lang Drydock, Hoboken, N. J. where she arrived at 2:20 P.M. Repairs were commenced on that evening and were completed on March 6th, the vessel's departure time from the shipyard being 5:45 P.M. She arrived off the Battery at about 6:00 P.M., the termination hour of detention claimed by libellant.

4. The principal physical damage was about the stem and adjacent bow plates and The O'Connor was undergoing repair of those damages during the entire period while at the shipyard. No repairs other than those made necessary by the collision were carried out during that time.

5. The vessel was necessarily detained from noon on February 23, 1945 until 6:00 P.M. on March 6, 1945, a period of eleven days, six hours.

6. The S/S Charles L. O'Connor had been requisitioned by the United States of America and on or about May 26,

1942, pursuant to Merchant Marine Act of 1936, as amended, 49 Stat. 2015, 53 Stat. 1254, 46 U.S.C.A. § 1101 et seq., the Government submitted and libellant accepted a Requisition Time Charter dated as of May 26, 1942 (Libellant's Exhibits 8, 8A, B, C). Subsequently this was replaced by what is called an Amended Time Charter dated as of June 5, 1944 and which was in force at the time of the accident in suit (Libellant's Exhibits 2, 3, 4).

7. The rate of hire fixed by charter between the United States of America and libellant, and in force at the time of the accident, was $19,033.11 per calendar month, so that the daily rate for February (a 28 day month) was $679.75 and for March (a 31 day month) was $613.97. The monthly rate of $19,033.11 was made up of a "use rate" and a "service rate" and was computed by reference to General Orders of the War Shipping Administration.[1]

8. Libellant's claim is computed by multiplying the February detention period of five and a half days by $679.75 which produces $3,738.63, and by multiplying the March detention period of five and three quarter days by $613.97 which produces $3,530.33, the two figures thus totalling $7,268.96.

9. The United States of America on March 9, 1945 paid to libellant the equivalent of the February detention period and on April 11, 1945 the equivalent of the March detention period, an amount said to be probably $7,268.54 and such amount was computed under Clause 4, page 3 of Part 2 of the Charter, dated as of June 5, 1944 and in evidence as Libellant's Exhibit 2 which is as follows:

"Clause 4. In the event that the Vessel is detained because of the happening of any event caused or contributed to by another vessel, person, corporation, or others, for which detention such third parties are or may be liable (the period of such detention to include the time necessary to proceed to, survey, and effect repairs unaccomplished upon the date of redelivery of the vessel under this Charter), then for such period of detention the Charterer's obligation to the Owner for hire and for other sums otherwise accruing hereunder shall cease: Provided, however, that the Charterer shall indemnify and save the Owner harmless from any loss whatsoever by reason of the cessation of such obligations, and notwithstanding said cessation shall pay to the Owner a sum not less than the amount which would otherwise be payable to the Owner for such obligations in the same manner and to the same extent as if such cessation had not occurred, but on performance of this indemnity the Charterer shall immediately become subrogated, to the extent of such indemnity, to all rights whatsoever of the Owner to recover for such detention from or against such vessel, person, corporation, or others, and the Charterer shall be entitled to bring and maintain suit or suits thereon in its own name or in the name of the Owner as the Charterer may see fit: Provided, however, That on the written

1. The use rate was computed by multiplying the vessel's dead weight capacity (4239 tons) by $1.15, the rate specified in War Shipping Administration General Order 37, Supplement 3, Section 302.107, Paragraph (b)—(Exhibit 7, page 13 and sub-division (b) on page 1 of Supplement 3, comprising part of Exhibit 7), the use rate thus computed being the "basic rate of bare boat charter hire" (sub-division (b), page 13, Exhibit 7). The service rate was computed in accordance with the formula in General Order 37 with appropriate deduction of $.06 per dead weight ton due to the fact that the speed of the vessel was less than 9 knots (page 14, Exhibit 7). Clause 6 of Part 2, Amended Charter (Libellant's Exhibit 2, page 3) provides that the owner shall provide and pay for the wages of master and crew, subsistence, maintenance and repair of vessel, owner's overhead expenses and other charges incidental to the operation of the vessel under the Time Charter.

request of the Charterer, the Owner shall in each instance, assert and prosecute such claims in the name of the Owner, but for and on behalf of the Charterer and at the Charterer's expense, such claims to be in a sum not less than the amount of the indemnity paid by the Charterer."

10. Libellant's damages should be allowed to the extent of 90% in accordance with the terms of the interlocutory decree, of $7,268.54, or $6,541.69, without interest.

## Discussion

Notwithstanding claimant's contention that the time charter is irrelevant and immaterial, for reasons which will be stated, Clause 4 of the charter is important to a decision of this matter for libellant's claim must either stand or fall by its application to the facts as found and reported. Two decisions, which have been the subject of discussion, in the opposing briefs are one in the Supreme Court, Robins Dry Dock & Repair Co. v. Flint, 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 and the other in our Circuit Court of Appeals, Agwilines Inc. v. Eagle Oil & Shipping Co., 2 Cir., 153 F. 2d 869, affirming a decision of Judge Caffey, sitting in the Southern District, The Agwidale, D.C., 61 F.Supp. 191, wherein the report of Wharton Poor, Esq., Commissioner on damages was confirmed. Libellant's reply brief frankly concedes that Clause 4 is a revised form which was prompted by the Agwilines decision in the Court of Appeals.

In that case the owner of The Agwidale claimed demurrage, which accrued during the time the vessel was undergoing repairs, following a collision of The San Veronico with it. A stipulation had been made between opposing proctors for payment of 85% of The Agwidale's provable damages. The matter before Commissioner Poor related solely to demurrage as the other items of damage had been agreed upon and the question was what damages is a ship owner entitled to for loss of use of his ship due to collision when under his charter party

hire continues to run and is paid by the charterer. The Agwidale was under time charter to the United States through the War Shipping Administration and pursuant to provisions of the charter the United States was under obligation to, and did pay libellant Agwilines one-half hire during the repair period under what was then designated charter party Clause 4. The San Veronico interests did not dispute liability for one-half hire, uncollected from the United States, but The Agwidale interests claimed that the fact that they had been paid part hire by the charterer during the detention was res inter alios acta, that the liability of The San Veronico was not thereby diminished, but that she was liable for the full loss of hire during the repair period.

Mr. Poor wrote an extended report, embodied in the District Court's decision, and in which he reviewed all of the authorities of Courts both here and abroad. He concluded that The Agwidale's owner was entitled only to the one-half hire for which it had not been reimbursed under the charter party with the United States because, under decisions which he reviewed, that was the extent of the loss which it suffered in this respect.

He made reference to the Robins Dry Dock case where time charterers of a Norwegian ship made claim against the shipyard for delay of several weeks resulting from negligence of the shipyard's employees in dropping and breaking a propeller, requiring that a new one be cast while the vessel was in the shipyard for minor repairs. The charterers sued the Robins Company and was successful in the District Court and Court of Appeals for this Circuit. However, the Supreme Court reversed the Lower Courts stating: "as a general rule, at least, a tort to the person or property of one man does not make the tort-feasor liable to another merely because the injured person was under a contract with that other unknown to the doer of the wrong. * * * The law does not spread its protection so far." [275 U.S.

303, 48 S.Ct. 135.] Proctors for The Agwidale conceded, in view of the Robins decision, that the United States had no direct claim against The San Veronico, but contended that the owners of The Agwidale nevertheless could recover the full hire though half had been paid them by the United States. A case which also influenced the Commissioner, the District Court and the Court of Appeals was the English one of Chargeurs Reunis v. England & A. M. Shipping Co., 1921, 9 Ll. L.L.R. 90 (Admiralty Division), affirmed at page 464 by the Court of Appeals. That was a case on all fours with the Robins case. It held that the French Government which had requisitioned the vessel and, under the terms of the charter party, was obligated to pay the owners certain sums named in the charter during the time the vessel was under repair acquired no more than a contractual right to use the vessel, that the ship always was and remained in the possession of her owners and that damages to the French Government arose only because, under the terms of the contract, it continued liable to make certain payments to the owners while getting no benefit from the ship during the period of detention. Therefore, it was held that it had no cause of action arising out of the negligence of the colliding vessel. The Court said that as the owners had received from the wrongdoers the whole loss they had sustained and damages were not recoverable by the French Government, because it had no right thereto, it did not lie in the mouth of the owners to say that they were in a better position to recover the demurrage claim.

In the Court of Appeals Judge Learned Hand wrote the majority opinion and Judge Clark wrote a dissenting one. In the course of his opinion Judge Hand said in 153 F.2d at page 870:

"The dispute here is therefore as to what profits the libellant lost by the detention; and we find it hard to believe that there could be any doubt about the answer, if the inquiry were confined to the owner's personal loss. Having parted with all use of the vessel to the United States during the detention, the libellant could not have made profits from that use; only so far as the detention prevented it from collection the consideration—the hire—in exchange for which it had parted with that use, could it be damaged. To this the libellant makes two answers, the first of which is that its loss was the value of the ship's use, whether the libellant personally received any benefit or not, because it does not lie in a tortfeasor's mouth to say that some third person—in this case the charterer—had indemnified his victim for his loss. (Citing authorities.) That doctrine we accept, but it has no application to the facts before us; for it presupposes that the tortfeasor has caused a loss, since otherwise it is absurd to speak of indemnity. As we have just said, the libellant suffered no loss from the detention of the ship, except the loss of the half hire during the repairs. By the charterparty it had already parted with all right to her use, and the collision could not result in depriving it of what it did not have. The charterer did indeed suffer a loss, for which, if we could, we should allow it to recover; but this branch of the libellant's argument does not stand upon the charterer's loss. The fact that it chances that the value of the use was the same as the hire, and that the libellant only claims the amount of hire must not disguise the fact that the payment of hire cannot be the measure of the loss of either owner or charterer. This would at once appear, if the value of the use had fallen after the charter-party was made; for it would then be plain that the collision had caused the charterer, not the loss of the hire for which it was bound anyway, but the loss of a lesser amount. And, conversely, if the value of the use had risen, al-

though on the libellant's theory the whole hire would be recoverable, it would not measure the charterer's loss, and it would not measure the owner's, even though we were to assume that the owner suffered any loss."

The second ground of recovery claimed by libellant was that the owner should recover for the charterer's loss on the same theory that a ship recovers as bailee of her cargo for cargo losses. The Court pointed out that the Supreme Court in the Robins Dry Dock case had rejected that argument although it had been used by the Court of Appeals and therefore, the Court of Appeals said in 153 F.2d at page 872:

"In the face of this decision we cannot see how we can do otherwise than affirm the decree at bar; if any change is to be made the Supreme Court must make it. And indeed, even though the matter were open to us, we should be faced with the decision of the Court of Appeal in England, decided upon facts which, so far as we can see, were on all fours with those before us. Chargeurs Reunis etc. v. English & American Shipping Co., 9 Lloyd's List L.R. 464."

In the dissenting opinion Judge Clark sharply disagreed with the majority opinion, stating that the Robins Dry Dock case had no such effect as was described in the majority opinion, since the action there was by the charterers and the Supreme Court disagreed with the Court of Appeals' deduction that because an owner could sue, a charterer also could sue for detention of the ship while under repairs following a negligent collision. In the course of his opinion Judge Clark made this statement in 153 F.2d at page 873, and which your Commissioner feels deserves careful attention in evaluating Clause 4 of the charter party under consideration:

"For in admiralty, as well as at law, there is no more solidly established principle than that payments or reparations of whatever nature which the injured party receives from a collateral source are, in the words of the courts, res inter alios acta, of no concern to the wrongdoer. Restatement, Torts, 1939, § 920, comment e; Sutherland on Damages, 4th Ed., Berryman, 1916, § 158, p. 487, and cases cited p. 488, n. 42, id. § 1295, p. 5014; Hale, Law of Damages, 1912, §§ 43–45, p. 186. This has been held true of compensation from an insurance company, The Steamboat Potomac v. Cannon, 105 U.S. 630, 26 L.Ed. 1194; The Propeller Monticello v. Mollison, 17 How. 152, 58 U.S. 152, 15 L.Ed. 68; Phoenix Ins. Co. v. The Steamboat Atlas, 93 U.S. 302, 23 L.Ed. 863; Mobile & Montgomery R. Co. v. Jurey, 111 U.S. 584, 4 S.Ct. 566, 28 L.Ed. 527, of payments under the Railroad Retirement Act, 45 U.S.C.A. § 228a et seq.; McCarthy v. Palmer, D.C.E.D.N.Y., 29 F.Supp. 585, affirmed 2 Cir., 113 F.2d 721, certiorari denied Palmer v. McCarthy, 311 U.S. 680, 61 S.Ct. 50, 85 L.Ed. 438, or a state compensation act, N.L.R.B. v. Marshall Field & Co., 7 Cir., 129 F.2d 169, 144 A.L.R. 394, affirmed Marshall Field & Co. v. N.L.R.B., 318 U.S. 253, 63 S.Ct. 585, 87 L.Ed. 744; Sprinkle v. Davis, 4 Cir., 111 F.2d 925, 128 A.L.R. 1101, and of hospital and medical expenses received from a state industrial commission, Overland Const. Co. v. Sydnor, 6 Cir., 70 F.2d 338.

"Nor is the rule confined to reparations which may be classified as insurance or indemnity where the injured party or some one acting in his behalf has contributed to the fund from which payment is made. Thus an owner may recover damages for injury to his buildings, although the terms of his lease require the tenant to continue payments. S. H. Kress Co. v. Bullock Shoe Co., 5 Cir., 56 F.2d 713. In nearly all jurisdictions, an employee may recover full damages for personal injuries, although he has received wages from

his employer during the period of illness, Shea v. Rettie, 287 Mass. 454, 192 N.E. 44, 95 A.L.R. 571; Campbell v. Sutliff, 193 Wis. 370, 214 N. W. 374, 53 A.L.R. 771; Hayes v. Morris & Co., 98 Conn. 603, 119 A. 901—a view which I understand my brethren to accept in citing this line of cases favorably. And an injured party may include as part of his damages medical services, although they have been gratuitously performed or paid for by relatives. Chicago, Duluth & Georgian Bay Transit Co. v. Moore, 6 Cir., 259 F. 490, certiorari denied 251 U.S. 553, 40 S.Ct. 118, 64 L.Ed. 411. See annotation 128 A.L.R. 687."

Mr. Poor had written in his report, 61 F.Supp., at page 197:

"If in the case at bar the charter party had provided that the Agwidale was off-hire during the detention, and libelant had held a policy of insurance insuring against loss of time, the San Veronico would have been liable for the full hire and the underwriters would have been subrogated to the recovery. That rule is inapplicable here, because libelant receives hire under a charter party and is not indemnified by underwriters. See judgment of Bankes, L.J. in the Chargeurs Reunis case, supra. This charter party can not be turned, at the option of the libelant and the United States, into something which it is not."

It is the libellant's contention in the instant case that the payments made by the United States to libellant (Finding 9) were not payments of charter hire, but indemnification for a loss which the owner had sustained because of the happening of an event caused or contributed to by the tug Rowen Card resulting in the detention of the vessel, during which period of detention the Charterer's obligation to the Owner for hire under the charter had ceased.

It may well be said by claimant, Card Towing Line Inc., that Clause 4, revised to its present form following the Ag-

wilines decision, was an ingenious method of circumventing the principle that a time charterer, having no property right in the vessel, may not sue for its loss resulting from detention and that the owner, having recovered its loss, may not, under Judge Hand's reasoning, claim that it should be again reimbursed by the wrongdoer. However, in your Commissioner's opinion, that is wholly beside the question whether the clause is valid ground for holding that since the charterer's obligation to the owner for hire had ceased, following the happening of an event caused by the negligence of The Rowen Card resulting in the detention of the vessel, and the "loss" having been indemnified by the charterer who became subrogated upon such payment, the owner may not recover for such detention of the vessel from The Rowen Card. Under the statement taken from Judge Clark's dissenting opinion and that of Mr. Poor in his report, of the principle that payments or reparations of whatever nature which the injured party receives from a collateral source are res inter alios acta, of no concern to the wrongdoer, libellant's claim for detention should be allowed unless Clause 4 is held to be invalid. It cannot be seen why indemnification and subrogation may not arise as between a charterer and owner, because it is established that the War Shipping Administration had the power to indemnify and insure the libellant against loss. 54 Stat. 689, 46 U.S.C.A. §§ 1128, 1128a; Executive Order 9054 dated February 7th, 1942, U.S.Code Congressional Service 1942, p. 154—Title C.F.R.Cum. Supp. page 1086; United States Lines Co. v. United States, D.C., 52 F.Supp. 758.

It is not believed that the fixation of damages beforehand has important bearing on the question. An insurance policy, valued at its inception, fixes the amount to be received by the assured by agreement between the parties beforehand, so that the indemnification phase of Clause 4, in so far as it serves to reimburse the owner for the precise amount of the loss suffered by reason of the cessation of the charterer's obligation for

hire, does not militate against its validity. In short, the owner and charterer of The Charles L. O'Connor clearly understood between them that the charterer would have no obligation whatever for hire lost during the repair of the vessel following a collision caused by a third party and therefore there was a loss suffered by the owner. That loss was indemnified and paid for by the charterer under a provision which recited that upon such payment the charterer became immediately subrogated in the extent of such indemnity to all rights whatsoever of the owner to recover for such detention from such other vessel and could require the owner to prosecute a·suit in the name of either owner·or charterer. When the injured libellant has received payment of its "loss" it in turn must comply with its obligation under the indemnification provision, just as it would if such loss had been insured against by a company in that business.

Therefore, your Commissioner finds and reports that the tug Rowen Card and its owner are liable to the libellant for the loss resulting from the detention of the S/S Charles L. O'Connor during the period of eleven days, six hours (Findings 4 and 5).

■ There remains for consideration the question of the rate of detention to be allowed. The proofs were made only by libellant without any opposing testimony on behalf of claimant Card Towing Line, Inc. The "loss" of the libellant must be measured by the charter party, in the absence of other evidence. In fact, it seems almost obvious that it is the only measure of libellant's loss. The Yaye Maru, 4 Cir., 274 F. 195; The Brand, 3 Cir., 224 F. 391; Agwilines v. Eagle Oil & Shipping Co., 2 Cir., 153 F.2d 869.

Accordingly your Commissioner finds and reports that, pursuant to the interlocutory decree libellant is entitled, as its loss for detention of the S/S Charles L. O'Connor, 90% of $7,268.54, or $6,541.69, without interest.

Subject to the approval of the Court, I fix my fee as Commissioner at $500. I certify that my fee as Commissioner has not been paid upon the filing of this report.

All of which is respectfully submitted.

Leonard P. Moore, U. S. Atty., by Benjamin H. Berman, New York City, for libellant.

Foley & Martin, by John J. McElhinney, New York City, for claimant.

INCH, Chief Judge.

Libellant moves to confirm the report of Frank C. Mason, Esq., the Special Commissioner appointed by this Court to ascertain and compute libellant's damages and to report thereon to the Court. Claimant, on the other hand, moves to have its exceptions to the Report sustained.

■ The Commissioner in a thorough and able report has found that libellant is entitled to recover $6,541.69 "as its loss for detention" of the S. S. Charles L. O'Connor. The Commissioner distinguished this case from Agwilines, Inc., v. Eagle Oil & Shipping Co., 2 Cir., 153 F.2d 869, on the ground that here the charter expressly provided that the vessel was "off-hire" during the detention and that the charterer indemnify the owner with a right of subrogation. While there is no doubt that there is some merit to claimant's exceptions, after a careful consideration of the Commissioner's Report and the authorities cited therein, I am satisfied that the equitable result reached by him is legally sound.

Accordingly, libellant's motion to confirm the Report is granted, and claimant's exceptions to the Report are overruled.

The Commissioner's fee is fixed and approved at $500.